UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
TODD C. BANK,                           :
                                        :
                    Plaintiff,          :
                                        :         **FINDINGS OF FACT AND**
        -against-                       :         **CONCLUSIONS OF LAW**
                                        :
HYDRA GROUP LLC,                        :              10 Civ. 1770 (VMS)
                                        :
                    Defendant.          :
                                        :
-------------------------------------------------------- x

**VERA M. SCANLON, United States Magistrate Judge:**

Plaintiff Todd C. Bank ("Plaintiff" or "Mr. Bank"), a pro se attorney, brings this action

against Defendant Hydra Group LLC ("Defendant" or "Hydra"), asserting a single cause of

action under Section 17529.5(a)(3) of the California Business and Professions Code, arising out

of three allegedly misleading commercial email advertisements that he received.  See generally

Amended Complaint, ECF No. 21.  The parties consented to this Court's jurisdiction, ECF No.

146, and a bench trial was held to determine Defendant's liability and damages, if any.  See

Transcript of Civil Cause for Bench Trial Before The Honorable Vera M. Scanlon ("Tr."), ECF

No. 155.

Based on consideration of the evidence introduced at trial, the parties' post-trial

submissions and the applicable law, the Court makes the findings of fact and conclusions of law

set forth in Parts III and IV.D below pursuant to Federal Rule of Civil Procedure 52(a).  The

Court finds that Defendant is not liable to Plaintiff under Section 17529.5(a)(3) of the California

Business and Professions Code.  The Clerk of Court is directed to enter judgment in favor of

Defendant and close the case.

## I.     EVIDENCE OFFERED AT TRIAL

During the bench trial, Plaintiff testified on his own behalf and was cross-examined by Defendant's counsel.  See Tr. 12:23-86:22.  Jared Balek Gordon, Hydra's general counsel during the relevant time period, was called by Mr. Bank and testified on direct- and cross-examination via video.  See Tr. 94:8-152:9.

### A.     Plaintiff's Testimony

Plaintiff testified that he received the three emails at issue at an email address belonging solely to Plaintiff and to which Plaintiff was the only person with access.  Tr. 14:6-14.  The first email was received by Plaintiff on January 22, 2010.  Tr. 14:15-16.  The second and third emails were both received by Plaintiff on January 27, 2010.  Tr. 15:16-25.  Printouts of Portable Document Format ("PDF") versions of the emails were admitted into evidence.  See Trial Exhibit 1; Tr. 16:15-17.[1]

The subject line of the first email received by Plaintiff stated: "**ATTN: Your Auto Insurance Renewal Reminder Jan 21. 2010**."  Trial Exhibit 1.  The subject line of each of the two subsequent emails received by Plaintiff stated: "**ATTN: Your Auto Insurance Renewal Reminder Jan 27. 2010**."  Id.  The "From" field in each of the three emails received by Plaintiff contained the following email address: Car.Insurance.Quotes@STARTSAVINGZ.COM.  Id.  The body of each of the three emails contained the following text:

---

[1] The PDF printouts of the emails were admitted for the purpose of "show[ing] that this is something [Plaintiff] received on [his] email address," and for no other purpose.  Tr. 16:5-14.

QUOTE WIZARD

My auto insurance company flew me to Maui!

CLICK HERE

I took the $487 I saved with QuoteWizard.com and bought a plane ticket to Hawaii.

What will you do with the money you save?

REQUEST QUOTES

**You Deserve Better Rates!**

At Quote Wizard, we think that your auto insurance company owes you a break – you deserve it! This summer, save some cash by comparing auto insurance rates and treat yourself right. A vacation? A new T.V.? When you save 40%, you can splurge!

After you fill out our simple online form, you'll receive quotes from the top providers in the nation. You can select a better policy and get a refund on your old policy the same day. That means money in your pocket right now. Request quotes today.

This is an advertisement from QuoteWizard.com. If you wish to no longer receive e-mails, click here. Or send postal mail to: QuoteWizard.com, 157 Yesler Way, Suite 400, Seattle, WA 98104.

Click Here to
UNSUBSCRIBE

WE'RE SORRY TO SEE YOU GO

Entourage Media Inc.
PO Box 515381 #35260
Los Angeles, CA 90051
United States
Tel +1 (888) 445-9246

Id. A portion of the text appeared over an image of two individuals on a beach (hereinafter, the "Image"). Id. The emails included multiple hyperlinks. See Tr. 36:19.[2]

---

[2] "A hyperlink is highlighted text or images that, when selected by the user, permit him to view another, related Web document." Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 n.1 (2d Cir. 1997) (internal quotation marks omitted); see Pearson Educ., Inc. v. Ishayev, 963 F.Supp.2d 239, 250 (S.D.N.Y. 2013) ("A hyperlink (or HTML instructions directing an internet user to a particular website) is the digital equivalent of giving the recipient driving directions to another website on the internet."). Based on the Court's review of the PDF printouts of the three subject emails admitted as Trial Exhibit 1, each email appears to have contained six hyperlinks.

Plaintiff testified that when he opened the first email he received, he "saw that the email from the body of it did not pertain to any particular reminder," and that "in fact . . . any auto insurance policy that [Plaintiff] had [at the time] . . . had not expired and was not due to expire [] around that time of year." Tr. 15:5-10. "In any event," Plaintiff testified, "the body of the email made clear that the subject line was misleading insofar as the subject line made it appear as if it pertained to my own [insurance] policy when the email was clearly instead, as shown by the body of it, a general advertisement for - - looking for quotes for auto insurance." Tr. 15:11-15.

Plaintiff testified that it was his understanding that Entourage Media, Inc. ("Entourage") "was the entity that physically . . . sen[t] the emails," Tr. 45:9-10, and that "as best [he could] tell," the "goods and/or services that were being promoted in the emails that make up [Trial] Exhibit 1 were for [Quote]Wizard," Tr. 38:17-19. Hydra's name does not appear in the emails. See Trial Exhibit 1; Tr. 37:15-18. As to the basis of his belief regarding Hydra's involvement with the emails, Mr. Bank testified that around the time he received each of the emails, he clicked on hyperlinks therein, and "the first site that . . . came up was what [] I call a jump site by which I mean a site that comes up and very quickly essentially goes away . . . and some other site comes up in its place." Tr. 36:18-25.[3] Plaintiff initially testified at trial that the "jump site" that appeared was "Hydranetwork.com, if I recall correctly." Tr. 36:25-37:3. Later in his testimony, Plaintiff stated that the "jump site" may have instead been LynxTrack.com:

---

[3] Plaintiff does not specify in his testimony which of the hyperlinks in which emails he clicked.

Q: And what was the domain when you jumped, as you testified earlier, what domain did you land on when you jumped?

A: As I said, as I stated before, Hydra Network and there might have been - - again, this is eight years ago, but as I'm sitting here now, it is - - sounds correct, it is correct, there was something called LynxTrack. And I think it was www. - - it might have had the http: as well. L-Y-N-X, Track, T-R-A-C-K, I suppose. And that - - again, I don't remember every detail. It was eight years ago, but either - - it went right to HydraNetwork.com or this LynxTracks, which then you type in that same website as a separate URL, then it - - that in turn jumped to Hydra Network. So I actually might have misspoken before. It might not have. I just don't remember. It might not have actually jumped to www.hydranetwork.com. It might have jumped - - and I'm starting to think it did instead - - to LynxTrack.com and then again very quickly disappears and becomes something altogether different. But then when you type in www.lynxtrack.com as if you wanted to just go to that website and nothing else, then that jumps to Hydra. It's like a mirror site or something like that.

Tr. 50:7-51:1. When asked if he had "anything to prove" his testimony regarding the "jump site," Plaintiff responded, "I don't have it here. I might have - - I might have records on my computer. I'm not sure." Tr. 51:2-4.

Plaintiff did not testify as to whether, prior to receiving the subject emails, he had provided consent to Entourage, QuoteWizard or Hydra to receive the emails, or had provided his email address to Entourage, QuoteWizard or Hydra. There was no testimony elicited about the location from which the emails were sent, particularly whether they were sent from California. The only connection to California on the face of the emails was the mailing address listed for Entourage. See Trial Exhibit 1.

During trial, Plaintiff attempted to access the three subject emails on a computer with internet access provided by the Court, see Tr. 22:21-23:11, 55:12-16, 57:24-58:3, and "screenshots" of "what [was] left" of the emails were admitted into evidence, see Tr. 58:4-9, 61:15-17, 66:17-19, 74:24-25, 80:8-13. Plaintiff clicked on hyperlinks contained in the emails accessed at trial and determined that each was "dead." Tr. 73:23-25, 82:11-13. With the

assistance of a Court technician, Plaintiff accessed hypertext markup language (HTML) versions of each email (printouts of which were admitted into evidence), which did not contain a reference to Hydra or LynxTrack. Tr. 83:3-25. Each of the hyperlinks displayed in the HTML versions of the emails identified a URL beginning with "http://STARTSAVINGZ.COM," followed by differing "letters and numbers and slashes." Tr. 76:19-23, 78:13-16.

**B.    Mr. Gordon's Testimony**

Mr. Gordon was employed by Hydra as its general counsel from January 1, 2010 to October 2010.[4] Tr. 94:22-95:3. He explained that Hydra operated an "affiliate network" named Hydra Network, which was essentially a "middle man between advertisers . . . [a]nd many independent publishers of advertising," known as "affiliates." Tr. 104:5-8. Mr. Gordon testified that Hydra Network was one of many affiliate networks in the market at the time. Tr. 159:13-18.

Through Hydra's affiliate network, authorized affiliates could log into Hydra Network's website (network.hydranetwork.com) to access and download advertising campaign information and materials that the affiliates "could publish on behalf of Hydra Network's advertisers." Tr. 113:16-20, 130:14:15. The Hydra Network website included graphics approved for use with specific advertising campaigns, approved subject lines, and payment details. Tr. 130:3-13. With respect to subject lines for email advertisements, Mr. Gordon testified that Hydra typically "would provide suggested subject lines [and] [m]any times [] would provide required subject lines so that affiliates could only use the specified subject lines." Tr. 134:25-135:3.

Hydra "provided tracking and . . . payment to the affiliate[s]." Tr. 111:2-4. Mr. Gordon explained that Hydra typically tracked advertisements in one of two ways. Tr. 111:10-11. In an

---

[4] Mr. Gordon testified that Hydra Group LLC changed its name to Marlborough Investment Group. Tr. 95:9-13. Use of the name "Hydra" during his testimony referred interchangeably to Hydra Group, LLC and Marlborough Investment Group. Tr. 95:25-96:3.

email advertisement, "the email might include what's sometimes called a pixel or also sometimes called a web beacon" which is a "1x1 invisible or white pixel or clear pixel that includes a hyperlink that . . . links the server when it's triggered." Tr. 111:9-15. A more typical method, generally used "when a third party [] was sending out email[s]," was tracking the advertisement "using our redirect," meaning a hyperlink that "would redirect to a particular domain of Hydra's. It would register with Hydra's server and then it would direct to the advertiser's landing page and there would typically also be a tracking pixel on that landing page. And then whenever the action was completed, the web page loaded at that time would have also had a tracking pixel." Tr. 111:16-25. Mr. Gordon testified that advertisers that had contracts with Hydra "paid Hydra an amount typically per action[,] [which] could be the generation of a lead[,] . . . the generation of a sale[,] [or] [i]n some instances[,] it could be a click . . . ." Tr. 123:17-21. Hydra would then pay its affiliates some portion of that amount. Tr. 123:22-23.

Mr. Gordon testified that LynxTrack.com was a domain that was owned by Hydra Network in January 2010, which Hydra "used for tracking purposes." Tr. 140:7-21. Mr. Gordon testified that if it was used by "a Hydra affiliate and a Hydra campaign," then when the recipient clicked a hyperlink in the advertisement, depending on his or her browser settings, the LynxTrack.com domain would appear for "like a second" before the recipient was re-directed to a "landing" site, typically the advertiser's URL. Tr. 141:10-142:7, 149:17-18.

In January 2010, there was a written contract in effect between Hydra and QuoteWizard.com, LLC ("QuoteWizard"), pursuant to which QuoteWizard made advertisements for its products available, via Hydra Network, to Hydra's affiliates, which could then publish those advertisements. Tr. 96:11-14, 98:10-15, 109:6-8. Mr. Gordon testified that it was his understanding that Entourage was an affiliate of Hydra at the relevant time, Tr. 115:10-11, and

that in January 2010, there was a written contract in effect between Hydra and Entourage.  Tr. 96:17-23.  There was no one contract to which all three entities–i.e., Hydra, QuoteWizard and Entourage–were each a party, and to Mr. Gordon's knowledge, QuoteWizard and Entourage did not have a relationship with one another.  Tr.  98:1-6.

A document entitled "Hydra Network Terms and Conditions" (hereinafter, the "Terms & Conditions") was admitted into evidence.  See Attachment C to Trial Exhibit 4; Tr. 98:16-100:9.[5]  The introductory paragraphs of the Terms & Conditions provide, in relevant part, as follows:

> The following terms and conditions (this "Agreement") is a legal agreement between Hydra Network, a division of Hydra Group LLC (interchangeably, "Company" or "Network"), and you (interchangeably, "Publisher," "Affiliate," "You" or "Your"), the user of the Hydra Network website (the "Site") . . . .
>
> These Hydra Network Terms and Conditions shall govern Your participation in Hydra Network . . . .

See Terms & Conditions 1.  Although Mr. Gordon was unable to locate a copy of the signed Hydra-Entourage contract, he testified that its text "would have been identical" to the text in the Terms & Conditions admitted into evidence.  Tr. 104:24-105:6-25.[6]

Mr. Gordon testified that in January 2010, Hydra "had an advertising campaign for QuoteWizard that included the [I]mage that appears in" the email printouts admitted as Trial Exhibit 1,[7] Tr. 125:22-24, but that he did not know whether Hydra "provided that particular

---

[5] Trial Exhibit 4 is a copy of Defendant's Amended Response to [Plaintiff's] First Request For Production of Documents and documents annexed thereto.  Tr. 98:16-24.

[6] Mr. Gordon explained that when Entourage "adopted the contract it would have been adopted via an online process where they would have had a scroll box that displayed the terms and conditions and they would have had to have checked or done something similar to [indicate] that they agreed with the contract."  Tr. 105:25-106:5.

[7] Mr. Gordon testified that he did not know whether Hydra or QuoteWizard designed the Image, but that it "would have been more typical" for QuoteWizard to provide an image to Hydra than vice versa.  Tr. 128:18-23, 129:16-19.

[I]mage used . . . in th[ose] particular . . . emails," Tr. 124:9-22, 125:24-126:1. He stated that QuoteWizard might have advertised with "other people using the same advertisements, for example," Tr. 126:3-4, or "other companies may have similarly provided that [] image to other affiliate networks," Tr. 127:23-128:2. Based only on the PDF printouts of the emails admitted as Trial Exhibit 1, Mr. Gordon was unable to determine whether the specific emails at issue were sent to Plaintiff as part of an advertising campaign with which Hydra was involved. Tr. 170:2-5.

## II.    POST-TRIAL SUBMISSIONS

Following the trial, Defendant filed three motions in limine seeking, respectively, to (1) preclude testimony from Plaintiff regarding technical aspects of the emails, such as their origination, ECF No. 153; (2) conform the pleadings to eliminate class claims, ECF No. 154; and (3) preclude Plaintiff from introducing evidence regarding his attorneys' fees on the basis that attorneys' fees are generally not awarded to self-represented plaintiffs, ECF No. 152.[8] Plaintiff filed a memorandum of law opposing Defendant's motions to preclude testimony regarding the emails and attorneys' fees. ECF No. 156.[9] Plaintiff submitted a post-trial memorandum of law in support of a finding that he met his burden of proof ("Pl.'s Mem."), ECF No. 157.

---

[8] Plaintiff argued the substance of these motions at the trial. Tr. 7:10-10:3.

[9] Plaintiff did not oppose Defendant's motion to conform the pleadings. That motion, ECF No. 154, is granted as unopposed to the extent that it seeks to remove "references to a class action." To the extent Defendant argues that this action should be dismissed for lack of subject matter jurisdiction, the motion is denied. Plaintiff sufficiently invoked federal jurisdiction at the time of his complaint under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(A), and the fact that Plaintiff did not pursue class claims does not deprive the Court of subject matter jurisdiction. See F5 Capital v. Pappas, 856 F.3d 61, 77 (2d Cir. 2017) ("[B]ecause jurisdictional facts are assessed at the time of removal and because at the time the complaint here appeared to plead in good faith the class claim necessary for jurisdiction, the fact that the [district] court subsequently determined that the case could not proceed as a class action under CAFA did not deprive it of subject matter jurisdiction.").

### III. FINDINGS OF FACT

The Court finds that the evidence proves the following facts material to the Court's conclusions:

(1) Plaintiff received the three emails admitted as Trial Exhibit 1 at his personal email address on January 22, 2010 and January 27, 2010, respectively. Trial Exhibit 1; Tr. 14:6-16; 15:16-25.

(2) The three emails advertised insurance products or services of QuoteWizard, a non-party to this action. Trial Exhibit 1; Tr. 15:13-15, 38:17-19, 46:2-3.

(3) The three emails contained information for unsubscribing that included the California mailing address for Entourage, a non-party to this action. Trial Exhibit 1; Tr. 45:9-10.

(4) In January 2010, there was a written contract in effect between Hydra and Entourage governing Entourage's participation, as an "affiliate" or "publisher," in Hydra Network, which is Hydra's affiliate network. Attachment C to Trial Exhibit 4; Tr. 96:17-23, 105:21-25, 115:10-11. An "affiliate" means a "publisher of advertising," which could include advertisements by email. Tr. 100:21-103:25.

(5) QuoteWizard and Hydra's affiliates engaged in a marketing campaign on behalf of QuoteWizard that included the Image. Tr. at 125:22-126:1.

(6) Hydra Network was one of many affiliate networks operating at the relevant time. Tr. 159:13-18.

(7)	LynxTrack.com was a domain Hydra "used for tracking purposes." Tr. 140:7-21. If used in a hyperlink in an email advertisement published by an authorized Hydra affiliate, the LynxTrack.com domain would appear momentarily after the hyperlink was clicked, before redirecting to a "landing" site, typically the advertiser's URL. Tr. 141:10-142:7; 149:17-18.

(8)	Hydra also used pixel tracking technology, through which it could track when a link was clicked by the recipient of an email advertisement from Hydra's affiliate network that was published by a Hydra affiliate. Tr. 111:16-25.

(9)	Neither the PDF printouts of the three subject emails admitted as Trial Exhibit 1 nor the HTML versions of the emails accessed at trial contained any reference to Hydra. See Trial Exhibit 1; Tr. 83:9-21

## IV.	LEGAL DISCUSSION

### A.	California's Anti-spam Law

Section 17529.5 of the California Business and Professions Code–a section of California's "Anti-spam Law," Cal. Bus. & Prof. Code § 17529.5 et seq.–provides, in relevant part, as follows:

> It is unlawful for any person or entity to advertise in a commercial e-mail advertisement either sent from California or sent to a California electronic mail address under any of the following circumstances:
>
> [ ]
>
> (3)  The e-mail advertisement has a subject line that a person knows would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message.

Cal. Bus. & Prof. Code § 17529.5(a). To prevail on a claim under subsection (3) of Section 17529.5(a), the subsection invoked by Mr. Bank in this action, a plaintiff must establish that a person or entity (1) "advertise[d]" (2) "in a commercial e-mail advertisement" (3) "either sent

from California or sent to a California electronic mail address" (4) when the "person knows" (5) that the email's subject line "would be likely to mislead a recipient, acting reasonably under the circumstances" (6) "about a material fact regarding the contents or subject matter of the message." Id. § 17529.5(a)(3). In the definitions section of the Anti-spam Law, "Advertiser" is defined as "a person or entity that advertises through the use of commercial email advertisements." Id. § 17529.1(a). "Commercial email advertisement" is defined as "any electronic mail message initiated for the purpose of advertising or promoting the lease, sale, rental, gift offer, or other disposition of any property, goods, services, or extensions of credit." Id. § 17529.1(c).

An action against a person or entity that violates Section 17529.5(a)(3) may be brought by "[a] recipient of an unsolicited commercial e-mail advertisement," id. § 17529.5(b)(1)(A)(iii), who may recover "either or both of the following: (i) Actual damages[]; (ii) Liquidated damages of one thousand dollars ($1,000) for each unsolicited commercial e-mail advertisement transmitted in violation of [Section 17529.5(a)(3)], up to one million dollars ($1,000,000) per incident," id. § 17529.5(b)(1)(B)(i)-(ii). A prevailing plaintiff in such an action may recover reasonable attorneys' fees and costs. Id. § 17529.5(b)(1)(C).

## B. Plaintiff's "Material Role" Theory Is Not Supported By The Statute Or Case Law

In his Amended Complaint, Plaintiff alleged that Hydra "sent" the emails. Amended Complaint ¶ 8, ECF No. 21. At trial and in his post-trial brief, Plaintiff proceeded under a new claim of liability–that although Hydra did not "physically" send the emails, it had a "material role" in sending them.[10] See Pl.'s Mem. 12-13, ECF No. 157; Tr. 45:9-14. Plaintiff's argument

---

[10] Although the Court rejects Plaintiff's claim on the merits, it is also rejected as a change in Plaintiff's claim without amending his pleading or notice to Defendant.

in his post-trial brief on this central issue, under the heading "Defendant Had a Material Role in

the Sending of the Emails," is set forth in full below:

> With respect to email advertisements, Section 17529.5(a)(3) does not limit liability
> to the sender and advertiser. First, it does not limit liability to the sender: "[i]t is
> unlawful for any person or entity to advertise in a commercial e-mail advertisement
> either sent from California or sent to a California electronic mail address under any
> of the following circumstances," Cal. Bus. & Prof. Code § 17529.5(a)(3) (emphasis
> added); see also Hypertouch Inc. v. ValueClick Inc., 192 Cal. App. 4th 805, 820
> (Cal. App. 2011) ("by its plain terms, the statute is not limited to entities that
> actually send or initiate a deceptive commercial e mail, but applies more broadly to
> any entity that advertises in those e-mails." (emphases added)); Bank v. American
> Home Shield Corp., No. 10 Civ. 4014 (PKC), 2013 WL 789203, at *2 (quoting
> same).

> Second, Section 17529.5(a)(3) does not limit liability to the advertiser. See Balsam
> v. Trancos, Inc., 203 Cal. App. 4th 1083 (Calif. App. 2012); Hypertouch, 192 Cal.
> App. 4th at 814.

> Hydra's material role in the sending of the Three Emails renders Hydra liable for
> having caused them to be sent. See People v. Reeves, 91 Cal. App. 4th 14, 50
> (Calif. App. 2001) ("The verb 'cause' means . . . '[t]o be the cause of; to effect,
> bring about, produce, induce, [or] make.' (Oxford English Dict. (2d ed. CD–ROM
> 1994); see also Webster's Collegiate Dict. [(2001)] <http://www.m-w.com/cgi-
> bin/dictionary> [first definition: 'to serve as a cause or occasion of'].)" (brackets in
> original except for brackets containing "(2001)"); see also Black's Law Dictionary
> at 221 (6th ed. 1990) (defining the verb "cause" as "[t]o be the cause or occasion
> of; to effect as an agent; to bring about; to bring into existence; to make to induce;
> to compel" (emphases added)). In addition, the noun "cause" means "[e]ach
> separate antecedent of an event. Something that precedes and brings about an effect
> or result. A reason for an action or condition. . . . That which in some manner is
> accountable for [a] condition that brings about an effect . . . ." Id. (emphases
> added).

> Hydra, as detailed in Evidence, supra, and by Plaintiff's Exhibits 1, 2, and 4, played
> a vital role in causing the Three Emails to be sent.[11]

Pl.'s Mem. 12-13.

---

[11] Where Plaintiff cited a case in short form, the Court has substituted the full citation for the
case the first time it appears in the passage. The Court has also substituted underlining for
italics. The passage is otherwise unaltered.

Plaintiff's argument fails as a matter of law for two reasons. First, implicit in Plaintiff's argument that "Section 17529.5(3) does not limit liability to the sender and advertiser," is the conclusion that the statute covers "senders" who are not also "advertisers." As discussed below, this conclusion is not supported by the plain text of the statute, legislative history or case law. Second, even if Plaintiff were correct in his interpretation that the statute covers all senders of commercial email advertisements, regardless of whether the sender itself advertised in the email, the effect of such an interpretation would be that Entourage, the entity that "physically" sent the email according to Plaintiff, would be covered by the statute, not Hydra.

Section 17529.5(a)(3) does not impose liability based on playing a "material role" in sending commercial email advertisements. As to the liability of a "sender" of a commercial email advertisement under Section 17529.5, the Northern District of California recently addressed this question and found that the statute does not extend liability to senders, unless the sender is also advertising in the email. See Blanchard v. Fluent, Inc., No. 17 Civ. 4497 (MMC), 2017 WL 4224768, at *2-3 (N.D. Cal. Sept. 22, 2017). The Blanchard Court first noted that "[n]either party has cited a case that expressly addresses the issue presented, nor has the Court located any such authority." Id. at *2; see id. ("Where . . . 'the state's highest court has not decided an issue [of state law], the task of the federal courts is to predict how the state high court would resolve it.'" (quoting Dimidowich v. Bell & Howell, 803 F.2d 1473, 1482 (9th Cir. 1986) (alterations in original))).

The Blanchard Court began its statutory interpretation by observing that in the same 2003 bill through which Section 17529.5 was enacted, the California Legislature (hereinafter, the "Legislature") also enacted Section 17529.2, which provides as follows:

Notwithstanding any other provision of law, a person or entity may not do any of the following:

(a) Initiate or advertise in an unsolicited commercial e-mail advertisement from California or advertise in an unsolicited commercial e-mail advertisement sent from California.

(b) Initiate or advertise in an unsolicited commercial e-mail advertisement to a California electronic mail address, or advertise in an unsolicited commercial e-mail advertisement sent to a California electronic mail address.

Cal. Bus. & Prof. Code § 17529.2; see Blanchard, 2017 WL 4224768, at *2-3[12]

The term "Initiate," which is found in Section 17529.2, but not in Section 17529.5, is defined in the statute as "to transmit or cause to be transmitted a commercial e-mail advertisement or assist in the transmission of a commercial e-mail advertisement by providing electronic mail addresses where the advertisement may be sent." Cal. Bus. & Prof. Code § 17529.1(i); see Blanchard, 2017 WL 4224768, at *3. This definition, according to the Blanchard Court, encompasses "the act of sending" commercial email advertisements. See Blanchard, 2017 WL 4224768, at *3. Thus, "[a]s the Legislature chose to prohibit the acts identified in [Section] 17529.2, when committed either by an advertiser in or sender of a commercial email, but chose to prohibit the acts identified in [Section] 17529.5 only when committed by the former, the 'normal inference' to be drawn is that the Legislature did not intend a sender of a commercial email, unless such sender is also an advertiser, to be liable under [Section] 17529.5." Id. (quoting Kleffman v. Vonage Holdings Corp., 49 Cal. 4th 334, 342 (2010), for the principle of statutory interpretation that hold that "[w]hen the Legislature uses materially different language

---

[12] Section 17529.2, which bans all unsolicited commercial emails sent to California residents, was preempted by the federal Controlling the Assault of Non-Solicited Pornography and Marketing ("CAN-SPAM") Act, 15 U.S.C. §§ 7701 et seq. The CAN-SPAM Act preempts any state statute that regulates the use of email for commercial messages, unless the state statute is limited to "falsity or deception" in commercial emails. See 15 U.S.C. § 7707(b).

in statutory provisions addressing the same subject or related subjects, the normal inference is that the Legislature intended a difference in meaning").

The <u>Blanchard</u> Court found additional support for this interpretation in the Legislature's express consideration, and rejection, of adding language to Section 17529.5 prohibiting those who "initiate" unsolicited commercial emails advertisements. <u>Id.</u> The year after the bill enacting Section 17529.5 passed, the Legislature considered and passed Senate Bill 1457, which amended Section 17529.5. <u>See</u> <u>Blanchard</u>, 2017 WL 4224768, at *3 (citing legislative record). As recounted in the <u>Blanchard</u> decision:

> [Senate Bill 1457], as initially drafted, proposed amending [Section] 17529.5 to expand its coverage to make it 'unlawful for any person or entity to initiate or advertise in a commercial e-mail advertisement' contained or accompanied by false or misleading information. When the Legislature later passed the bill, however, it deleted the words 'to initiate' and, while amending other provisions of the statute, retained the existing language making it 'unlawful for any person or entity to advertise in a commercial e-mail advertisement' containing or accompanied by false or misleading information.

<u>Id.</u> at *3. In light of this legislative history, the <u>Blanchard</u> Court concluded that it "cannot 'judicially write' the words 'to initiate' into §17529.5." <u>Id.</u> (quoting <u>Sierra Club v. Cal. Coastal Comm'n</u>, 35 Cal. 4th 839, 856 (Cal. App. 2005), for the principle of statutory interpretation that if the Legislature has "considered, but rejected, proposed language" for inclusion in a statute, a court "may not judicially write the deleted provisions back into the [statute]").

The <u>Blanchard</u> Court's statutory analysis is further confirmed by recent efforts by the California Legislature to amend Section 17529.5(a)(3). On February 15, 2018, Assembly Bill 2546 ("AB-2546") was introduced in the California Assembly to amend Section 17529.5 to, <u>inter alia</u>, add that it is unlawful to "<u>initiate</u> or advertise" in a commercial email advertisement. <u>See</u> AB-2456, 2017-18 Reg. Sess. (Cal. 2018) (emphasis added). According to the bill's author, AB-2546 "would expand California's anti-spam law to provide that it is not only unlawful for any

person or entity to 'advertise in' a commercial email, but unlawful for a person or entity 'to

initiate, advertise in, or enable or assist a person or entity to initiate or advertise in,' a

commercial email advertisement . . . ."  AB-2456, Assemb. Comm. On Privacy & Consumer

Protection Hr'g.  The Author's Statement further provides:

> Under existing law, advertisers are strictly liable for false and deceptive spam.
> However, the actual senders of the emails are not liable for sending the unlawful
> spams.  AB 2546 would strengthen California's prohibitions on false and deceptive
> spam emails in a number of ways by . . . holding spam networks and the actual
> senders liable for false and deceptive spamming . . . .

Id.  According to the Legislature's website, the bill "[d]ied on inactive file" on November 30,

2018.[13]  This Court finds the Blanchard Court's analysis persuasive.

In support of his argument that Section 17529.5 "is not limited to advertisers," Plaintiff

cites two California Court of Appeals cases: Hypertouch Inc. v. ValueClick Inc., 192 Cal. App.

4th 805 (Cal. App. 2011), and Balsam v. Trancos, Inc., 203 Cal. App. 4th 1083 (Cal. App. 2012).

The issue of whether statutory liability extends to a sender of a commercial email advertisement,

where the sender did not itself advertise in the email, was not before the court in either of the

cited cases.[14]

In Hypertouch, the plaintiff alleged that the defendants "had advertised in over 45,000

e-mails received by [the plaintiff's] customers."  Hypertouch, 192 Cal. App. 4th at 815

(emphasis added).  The Hypertouch Court held that "for purposes of [S]ection 17529.5, the

---

[13] See AB-2546 Commercial email advertisements (2017-2018) Bill History, California
Legislative Information,
https://leginfo.legislature.ca.gov/faces/billHistoryClient.xhtml?bill_id=201720180AB2546 (last
visited March 29, 2019).

[14] Indeed, although the briefing considered by the Court in Blanchard included extensive
discussion of Hypertouch and Balsam, the Blanchard Court, as noted above, found that the issue
presented had never been expressly addressed.  See Blanchard, 2017 WL 4224768, at *2.

relevant question is not whether [the plaintiff] can demonstrate that [the defendants] sent or had knowledge of the e-mails, but rather whether they advertised in those e-mails." <u>Id.</u> at 835. In light of the evidence in the record, including that "at least some portion of the [45,000] e-mails . . . contained a link redirecting the consumer to [the defendants' own] promotional material," the <u>Hypertouch</u> Court found that a triable issue of fact remained "as to whether [the defendants] 'advertised' in the e-mails at issue.'" <u>Id.</u>; <u>see id.</u> at 814 (describing how email advertisements sent by affiliates of one of the <u>Hypertouch</u> defendants included hyperlinks redirecting consumers to promotions on that defendant's own websites, where the consumer could earn rewards offered by the defendant in exchange for participating in the advertised promotional offers); <u>id.</u> at 835 n.16 (noting that the record contained "additional evidence filed under seal pertaining to this triable issue" of whether defendants "advertised" in the emails).

In <u>Balsam</u>, the issues before the court were: (1) whether the plaintiff had standing to sue under the Consumers Legal Remedies Act and whether the defendant's employee was jointly and severally liable for the defendant company's violation of Section 17529.5; (2) whether "the sending of commercial e-mails from multiple and nonsensically named domain names [] violate[s] section 17529.5(a)(2); and (3) whether "the federal CAN-SPAM Act preempts application of California's Anti-spam Law . . . absent a finding of all elements of common law fraud." <u>See Balsam</u>, 203 Cal. App. 4th at 1093-94. The <u>Balsam</u> Court did not address whether Section 17529.5(a)(3) is appropriately interpreted as applying to persons or entities that send, but do not advertise in, commercial email advertisements.

Even if the Court were to accept that liability under Section 17529.5 could extend to a person or entity that merely sends an email without advertising in it, Defendant's claim would require the Court to extend the statute yet another step further–to persons or entities that play a

"material role" in sending commercial email advertisements.  There is no support from the statute or case law for such a theory of liability.[15]

### C. Plaintiff Has Not Established Defendant's Involvement In The Sending Of The Emails

Even if the Court were to agree with Plaintiff's theory that an entity that plays a "material role" in sending an email advertisement could be found liable under Section 17529.5, Plaintiff has failed to prove by a preponderance of the evidence that Defendant played such a role with respect to the subject emails.  The only evidence of Hydra's involvement with the subject emails presented by Plaintiff is his own recollection of being directed momentarily to a "jump site" after clicking on hyperlinks in the emails.  See Tr. 36:25-37:3, 50:7-51:1.  Plaintiff first testified that the "jump site" that appeared was www.HydraNetwork.com, Tr. 36:25-37:3, but later in this testimony stated it may have been www.LynxTrack.com, Tr. 50:7-51:1.[16]  Plaintiff himself appears to acknowledge the limited reliability of his recollection in light of the fact that the emails were received over eight years prior to the trial.  See, e.g., Tr. 50:14-15 (". . . again, this is eight years ago . . . .  I don't remember every detail").  Indeed, Plaintiff was unable to recall other details from the time; for instance, although he testified that "shortly after" receiving the emails, he contacted QuoteWizard and spoke with someone by telephone, he could not recall

---

[15] In earlier proceedings in this case, Plaintiff argued that Hydra "advertised" in the emails, but Plaintiff did not pursue that claim at trial or in post-trial briefing.  See, e.g., Tr. 15:13-15 ("the email was clearly . . . a general advertisement for - - looking for quotes for auto insurance"); Tr. 38:17-19 ("[A]s best I [could] tell" the "goods and/or services that were being promoted in the emails that make up [Trial] Exhibit 1 were for [Quote]Wizard.").  The Court notes that even under Plaintiff's version of the facts, in which QuoteWizard made its advertisements available to Hydra's affiliates through Hydra Network, and used a "jump site" for tracking purposes, there would not be a basis for concluding that Hydra "advertised" in the emails.

[16] It is worth noting Plaintiff's Amended Complaint does not contain any mention of a "jump site."  See generally Amended Complaint.

with whom he spoke or what the sum and substance of the calls were.  Tr. 42:12-43:23.

Plaintiff did not present any evidence to corroborate his testimony that when he clicked on the hyperlinks in the subject emails he was directed to a "jump site," either LynxTrack.com or HydraNetwork.com.  The HTML versions of the emails accessed at trial, including the URLs identified in the hyperlinks therein, do not indicate any connection to Hydra.  Tr. 76:19-23, 78:13-16, 83:3-25.  Although there is no evidence as to whether HTML versions of the emails at the time they were originally received by Plaintiff would have been capable of showing such a connection, Plaintiff's failure to preserve such evidence leaves that question unanswered.

In Defendant's view, "the absence of an expert analysis and expert testimony precludes an inference, much less a finding, that the three emails originated and/or somehow arise from defendant."  Defendant's Motion In Limine as to Evidence 5, ECF No. 153.  The Court need not decide whether expert testimony or analysis would always be required to establish a defendant's connection to a particular email, as Defendant appears to argue.  See, e.g., Lorraine v. Markel Am. Ins. Co., 241 F.R.D. 534, 559 (D. Md. 2007) ("The methods of authentication most likely to be appropriate for computerized records are [Federal Rule of Evidence] 901(b)(1) (witness with personal knowledge), 901(b)(3) (expert testimony), 901(b)(4) (distinctive characteristics), and 901(b)(9) (system or process capable of producing a reliable result)."); see also id. at 552 ("Rule 901(b) makes clear that the ten examples listed are illustrative only, not exhaustive.  In ruling on whether electronic evidence has been properly authenticated, courts have been willing to think 'outside the box' to recognize new ways of authentication.").  Had Plaintiff, for instance, confirmed through discovery that Hydra Network was the only affiliate network used by Entourage to advertise QuoteWizard products or services, or that QuoteWizard used the Image only in advertisements made available to affiliates on Hydra Network, such evidence might have

helped to carry Plaintiff's burden.   Plaintiff may have been able to establish Hydra's involvement had he preserved a record of the "jump site" to which he was directed when he clicked on the hyperlinks in the subject emails, through the use of, for instance, screenshots, printing, or even a video recording of his computer screen showing what occurred when he clicked on a hyperlink.  See, e.g., United States v. Cyberheat, Inc., No 05 Civ. 457 (TUC) (DCB), 2007 WL 686678, at *8-9 (D. Ariz. Mar. 2, 2007) (discussing methods used to "preserve[] the web page or pages to which the hyperlinks [in the emails at issue] redirected"). Likewise, Plaintiff may have been able to establish Hydra's involvement by obtaining evidence that the email address at which he received the subject emails appeared in tracking data kept by Hydra, Entourage or QuoteWizard and related to the QuoteWizard advertisements.

**D.     Conclusions Of Law**

Based on the evidence and relevant law, the Court makes the following conclusions of law:

(1)    As Plaintiff's testimony is indeterminate as to a connection between the subject emails and Hydra, and Plaintiff has failed to present any evidence corroborating his testimony that the hyperlinks in the subject emails directed him to either LynxTrack.com or HydraNetwork.com, Plaintiff has failed to prove by a preponderance of the evidence that Hydra had any involvement in the subject emails, as an advertiser, or sender, or even as a provider of material assistance.

(2)    Plaintiff has also failed to prove by a preponderance of the evidence that the subject emails were unsolicited.

(3)    Plaintiff has failed to prove by a preponderance of the evidence that any of the subject emails were sent to or from California.

(4)    Section 17529.5(a)(3) of the California Business and Professions Code does not extend liability to a person or entity for playing a "material role" in sending commercial email advertisements.

(5)    For the foregoing reasons, the Court finds that Defendant is not liable to Plaintiff under Section 17529.5 of the California Business and Professions Code.[17]

The Clerk of Court is respectfully directed to enter judgment in favor of Defendant Hydra Group LLC and close the case.

Dated: Brooklyn, New York
      March 31, 2019

                                      *Vera M. Scanlon*
                                      Vera M. Scanlon
                                      United States Magistrate Judge

---

[17] In light of Plaintiff's failure to establish Defendant's liability under Section 17529.5 for the reasons stated above, the Court does not address whether Plaintiff has sufficiently established that the emails had subject lines "that a person knows would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message." See Cal. Bus. & Prof. Code § 17529.5(a)(3). Likewise, the Court does not address whether a pro se attorney would be entitled, as a prevailing party, to recover attorneys' fees under Section 17529.5(b)(1)(C), so Defendant's motion as to attorneys' fees is moot.